2026 IL App (1st) 250894-U

SECOND DIVISION
August 4, 2026

No. 1-25-0894

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| AIDA VASQUEZ, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | 24 OP 74299 |
| | ) | |
| ROBINSON AGUILAR, | ) | Honorable |
| | ) | Jonathan Clark Green |
| Respondent-Appellant. | ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Justices McBride and D.B. Walker concurred in the judgment.

## ORDER

¶ 1    *Held*: Reversed. Court did not make required findings in entering order of protection.

¶ 2    After briefly living together, respondent Robinson Aguilar evicted his girlfriend, petitioner Aida Vasquez, from their shared home, a condominium unit Robinson owned. Aida was unable to get her belongings from the condominium, so she filed for an emergency order of protection. The court denied the emergency petition but ordered Robinson to enable her to fully move out of the condo. By the time the court held the hearing on the plenary order of protection, the moveout had been completed, Aida had returned to Florida; there was no longer any interaction between the two.

¶ 3    Despite the fact that the situation appeared resolved, the court entered a "short" three-month plenary order of protection, which, among other things, awarded Aida costs for the illegal eviction. On appeal, Robinson argues the court erred in failing to make the findings required to enter an order of protection under the Illinois Domestic Violence Act, 750 ILCS 60/101, *et seq.* (West 2024) (IDVA). We agree. We have no choice but to reverse the order of protection.

¶ 4                                BACKGROUND

¶ 5    After a five-month long-distance relationship, Aida moved from Florida into a condo unit Robinson owned. Though they were in a romantic relationship, Aida needed a lease for insurance purposes, so in September 2023, the couple executed one, though Aida was not required to pay rent or any other costs.

¶ 6    The relationship would prove to be short-lived. In April 2024, Robinson discovered evidence that he believed proved that Aida had been unfaithful to him. (Aida claims that he "hacked" her phone to find text messages. Her initial petition alleged that he "went through my phone without my permission because I was unaware he knew my passcode.")

¶ 7    On April 9, 2024, Robinson kicked Aida out of the condo. Aida learned of the "eviction" because Robinson had texted her brother a photo of two packed suitcases. Aida's brother let her know: "Robby bought you a ticket back home. He packed your bags."

¶ 8    Aida returned to the building to discover that she could not get in, and Robinson refused to speak with her. A neighboring couple helped Aida by renting her a hotel room for the night. According to the husband, Aida was utterly distraught. Over the next few weeks, Aida tried to recover her personal property from the condo but was not completely able to, largely because Robinson refused to interact with her. With the help of police, she was able to get *some* of her

stuff, but she claimed she was unable to get important things such as "my 2 passports for my dual citizenship" and large furniture.

¶ 9    On May 14, Aida sought an emergency order of protection (OP) against Robinson. The emergency OP requested, among other things, that *she* be given exclusive possession of the home. The same day, the court declined to enter an OP on an emergency basis but continued the case to determine whether a plenary OP was warranted. On May 15, Aida moved to reconsider and amend her emergency OP. The court granted the motion to amend and granted her *some* relief. Specifically, the court ordered that: "[Aida] shall be allowed into the Residence to collect her belongings. [Robinson] shall not prevent [Aida] from retrieving her belongings."

¶ 10    The Cook County Sheriff's office unsuccessfully attempted to serve the order and petition on Robinson. On June 4, the court entered another order allowing Aida to serve Robinson at a different address. (It appears this was his parents' address.) The June 4 order repeated the language that Aida was allowed into the residence to gather her belongings. On June 7, the Sheriff's office effectuated service.

¶ 11    Armed with the orders, Aida had the police assist her with retrieving her things. At some point after the June order, Aida, along with two movers, gathered her remaining possessions from the condo. One of the officers later testified that Robinson was present (with his attorney) but did not obstruct in any way. As the officer recalls, Robinson went through the house and placed sticky notes on the things Aida was not allowed to take.  From what we can tell, the move-out went relatively smoothly. (Aida did not remove all her belongings at that time; she left many larger items in the apartment. At some point, Robinson got permission from the court to move these items into storage, at Robinson's expense.)

¶ 12     Despite the "formal" move-out, Aida continued to claim that for several months, Robinson refused to turn over personal information which she had stored in a garbage bag and that he was committing "identity theft." Aida's claims then shifted from focusing on the lockout to a few other things. For example, she claimed that she feared Robinson had stolen personal information and would use his knowledge and experience as a law enforcement officer to "investigate" and harass her. As Aida put it at the hearing, she was very worried he would hurt her "life down the road."

¶ 13     The court finally held the hearing on the plenary order in November 2024. By the time of the hearing, Aida had moved back to Florida but would not provide a specific address or location. While several witnesses testified at the hearing, Robinson notably did not. The majority of the trial was consumed by the court's questioning of Aida, who was *pro se*. She primarily recounted the facts outlined above and attempted to convince the court that Robinson was continuing to harass her. For our purposes, one important exchange took place during Aida's closing statement. As Aida was recounting that she was "begging for [her] belongings," the Court jumped in to ask: "You got everything now, right?" Aida responded: "Yes."

¶ 14     After two days of testimony, the court entered its oral findings. The court, though noting that "[t]his is obvious[ly] not an emergency situation," found that the lockout and subsequent delay in allowing Aida to gather her belongings constituted "abuse" under the IDVA. The court told Aida that, "for the purposes of what actually occurred to you in the way of having difficulty getting your things, being locked out without notice even though you have an interest in the property, I think you were very credible in that."

¶ 15     The court had a very different opinion about Aida's claims of future harm:

"The idea of any missing documents, that I find a little fishy frankly by Ms. Vasquez, that whether there's some particular documents that you're threatening her with for to really make her position as a citizen, if she has passport[s] and everything, I don't understand how that would cause her problems.

I think it's more perhaps of a defense if there's some further investigations going on. I don't know. That can be handled perhaps in an investigation evidence in those other cases maybe. I don't see other than a testimony there was a garbage bag."

The court elaborated: "this other stuff about going after him or, you know, investigations, what kind of documents there may be, I understand you're very angry. I don't think it's risen to the level, you know, as I mentioned an order of protection."

¶ 16    In turning to whether to enter the order of protection, the court stated:

"[B]asically I believe that [Aida] has shown *** that some limited perhaps but some abuse did occur in that way. She had a property interest that had to be recognized. The police had to be called in. Even when they had orders, civil orders to allow access, there were delays in getting her access. And so in that way, I believe [Aida] did meet after hearing her burden of proof for an order."

¶ 17    Given its finding that abuse occurred a few months earlier, the court felt bound to issue an OP but said it would "give it one of the shortest times I've given in any of these cases and that will be three months," from the date of ruling (November 12, 2024) to February 12, 2025. The court also allowed Aida to petition for "moving and hotel expenses" related to the lockout.

¶ 18    The court recognized that the OP would cause Robinson to lose his gunowner rights and suspend his FOID and concealed-carry licenses in Illinois, which would obviously impact his ability to discharge his duties as a federal law enforcement officer. But the court believed "there

are various provisions that [Robinson] can exercise within federal law if he needs to continue his job and have like limited access to his firearm for those purposes."

¶ 19    In December 2024, Robinson filed a motion to reconsider. In January 2025, before the court had ruled on the motion to reconsider, Aida moved to extend the OP, arguing that the ongoing "identity theft" issue warranted extension. She claimed that Robinson's "stealing" of "sensitive documents, constitute[s] an illegal search and seizure of Petitioner's personal property." She claimed: "Violation of Fourth Amendment Rights," "Hacking and Remote Surveillance," "Intimidation and Continued Abuse," and "Ongoing Fear and Safety Concerns."

¶ 20    On February 5, 2025, just before the OP was set to expire, the court denied the motion to extend "for reasons stated on the record." (We have no transcript of this hearing.)

¶ 21    Finally, on April 9, 2025, the court held its final hearing in this matter. The court denied Robinson's motion to reconsider and awarded Aida $2,290.97 for expenses incurred in moving and for her temporary stay in a hotel. See 750 ILCS 60/214(b)(13) (West 2024) (order of protection may provide for "moving or other travel expenses" and "reasonable expenses for temporary shelter" caused by respondent's abuse).

¶ 22    On May 9, 2025, Robinson filed his notice of appeal. Briefing was not completed until April 2026, in large part due to Aida's delay in filing her *pro se* response brief (over Robinson's repeated objections).

¶ 23                                    ANALYSIS

¶ 24    We begin with two preliminary matters, jurisdiction and mootness.

¶ 25                                    I. Jurisdiction

¶ 26    Robinson's appeal is timely. He could have immediately appealed the OP under Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017). See *In re Marriage of Sanchez and Sanchez-*

*Ortega*, 2018 IL App (1st) 171075, ¶ 34 ("[a]n order of protection is injunctive in substance."). But he was not required to do so; he could opt, as in a traditional civil case, to appeal within 30 days of the denial of the post-judgment motion. See Ill. S. Ct. R. 304(a)(1) (eff. July 1, 2017); *Martinez v. Singh*, 2021 IL App (1st) 201027-U, ¶ 13 (party subject to OP may immediately appeal or wait until denial of timely post-judgment motion); *In re K.B.*, 2019 IL App (4th) 190496, ¶ 52 (same); see also *In re Haley D.*, 2011 IL 110886, ¶ 63.

¶ 27    Robinson chose the latter route, declining to seek expedited consideration. He filed his notice of appeal on May 9, 2025, within 30 days of the April 9 denial of his timely post-judgment motion. See Ill. S. Ct. R. 304(a)(1) (eff. July 1, 2017). His appeal was timely.

¶ 28    Aida, in her *pro se* response brief, raises several points of error that, in her view, require reversal in part of the court's judgment. For example, she claims the court committed "multiple legal errors" in reducing her cost award to just over $2,000, when she sought well over $10,000.

¶ 29    We lack jurisdiction to review any errors Aida raises, as she did not file a notice of appeal of the court's judgment, nor did she file a notice of cross-appeal in response to Robinson's notice of appeal. See Ill. S. Ct. R. 303(b)(iii) (eff. July 1, 2017). The filing of a notice of appeal is the lone jurisdictional step initiating appellate review. *People v. Smith*, 228 Ill. 2d 95, 104 (2008). Absent a timely-filed notice of appeal, "a reviewing court has no jurisdiction over the appeal and is obliged to dismiss it." *Id.*; see *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill. 2d 209, 217 (2009) (timely notice of appeal is "both jurisdictional and mandatory").

¶ 30    We will obviously consider Aida's brief insofar as it addresses Robinson's claims of error, but we will not consider any claims of error raised by Aida in her brief.

¶ 31                                        II. Mootness

¶ 32    An appeal is moot when the reviewing court cannot provide the appellant meaningful

relief. *McHenry Township Road District v. Pritzker,* 2021 IL App (2d) 200636, ¶ 34. An appeal from an order of protection that has expired is often moot, as the order no longer impacts the appellant. See *Landmann v. Landmann*, 2019 IL App (5th) 180137, ¶ 11. Aida asks us to find this appeal moot; Robinson argues that the OP still impacts his status as a law enforcement officer, especially his right to carry a firearm, so this court could provide him meaningful relief. See *Martinez*, 2021 IL App (1st) 201027-U, ¶ 16 (appeal was not moot, as expired OP impacted appellant's immigration status; reversal would provide effectual relief).

¶ 33    The impact on Robinson's gunowner rights (and thus his job) is likely enough by itself to overcome the mootness doctrine. But this appeal is not moot for a different reason: as noted, the order of protection included a monetary award against Robinson for Aida's moving and hotel expenses pursuant to the IDVA. See 750 ILCS 60/214(b)(13) (West 2024).

¶ 34    We could obviously provide Robinson meaningful relief were we to reverse the OP and thereby the damages award as well. See *2242 Archer Court, LLC v. Roberts*, 2023 IL App (1st) 221655-U, ¶ 16 (appeal of award of damages within already-executed eviction order was not moot). The mootness doctrine does not prevent our consideration on the merits.

¶ 35                          III. Failure to Make Required Findings

¶ 36    We move to Robinson's sole argument on the merits: that the court failed to make the findings required by Section 214(c) of the IDVA before entering the OP.

¶ 37    The purpose of the IDVA is "to protect victims of domestic violence from *further* acts of physical, emotional, and verbal abuse." *In re Marriage of Kriley*, 2025 IL App (1st) 241923, ¶ 73 (emphasis in original); see *Dibenedetto v. Dibenedetto*, 2019 IL App (3d) 180761, ¶ 15 ("The [IDVA] aims to protect victims of domestic violence from further acts of physical, emotional,

and verbal abuse."); *Wilson v. Jackson*, 312 Ill App. 3d 1156, 1166 (2000) (purpose of IDVA "is to aid victims of domestic violence and prevent further abuse."). To that end, the IDVA provides:

"the court shall make its findings in an official record or in writing, and shall at a minimum set forth the following:

(i)  That the court has considered the applicable relevant factors described in paragraphs (1) and (2) of this subsection [nature, frequency, and severity of abuse, likelihood of future abuse, and effect of any remedy on parties].

(ii) *Whether the conduct or actions of respondent, unless prohibited, will likely cause irreparable harm or continued abuse.*

(iii) *Whether it is necessary to grant the requested relief in order to protect petitioner or other alleged abused persons.*" 750 ILCS 60/214(c)(3) (West 2024) (emphasis added).

¶ 38    The second and third findings in section 214(c)(3) are obviously concerned with protecting the petitioner from future abuse. But it is clear from the record that the trial court made neither of these findings. Nowhere in its oral ruling or in its written order did the court find, expressly or implicitly, that "the conduct or actions of respondent, unless prohibited, will likely cause irreparable harm or continued abuse." *Id*. § 214(c)(3)(ii). Nor did the court, either orally or in writing, find it "necessary to grant the requested relief in order to protect petitioner or other alleged abused persons." *Id*. § 214(c)(3)(iii).

¶ 39    Given the findings the court *did* make, it seems rather obvious that the court did not make either of these two required findings because it did not believe them to be true. The court clearly believed that, in locking Aida out of the house where she lived and denying her immediate access to her belongings, Robinson committed "abuse" under the IDVA.

¶ 40   But while it found Aida credible in testifying about the lockout, the court did *not* find Aida credible in her concern that Robinson would commit identity theft or investigate her in the future or tamper with her passports; the court found those claims "a little fishy frankly." The court elaborated: "this other stuff about going after him or, you know, investigations, what kind of documents there may be, I understand you're very angry. I don't think it's risen to the level, you know, as I mentioned an order of protection."

¶ 41   And remember that, by the time the hearing on the plenary OP hearing had taken place, the lockout was at least five months in the past; the court had confirmed that Aida now had all her belongings; and the parties by then lived hundreds of miles apart. As the court put it: "As far as I hear, there's not much going on between you and hopefully that will be the way it remains."

¶ 42   It appears, in other words, that the court's failure to make these two required findings was not a mere oversight; the court did not believe those facts to be true. The court clearly found that abuse (the lockout) had occurred in the past, but it found no threat of future harm to Aida.

¶ 43   Regardless, whether inadvertent or intentional, the court's failure to make these mandatory findings under section 214(c) carries an undeniable consequence: we must reverse the order of protection. See *People v. Lawrence*, 2020 IL App (1st) 171399, ¶ 37 ("Because the trial court did not comply with section 214, we reverse the order of protection * * *."); *People v. Brand,* 2020 IL App (1st) 171728, ¶ 54 ("We will reverse the trial court's entry of an order of protection if it fails to make the required findings."); *Landmann*, 2019 IL App (5th) 180137, ¶ 19 (reversing OP for failing to make specific findings under section 214(c)); *Hedrick-Koroll*, 352 Ill. App. 3d 590, 594 (2004) (collecting cases: "The failure to make the required findings is reversible error."); *People ex rel. Minteer v. Kozin*, 297 Ill. App. 3d 1038, 1043 (1998) ("we reverse the entry of the order of protection on the basis that the trial court failed to meet its

statutory obligation to make specific findings"); *In re Marriage of Healy*, 262 Ill. App. 3d 596, 602 (1994) (OP reversed for failing to comply with "specific statutory mandate to make appropriate findings."); *Martinez*, 2021 IL App (1st) 201027-U, ¶ 26 ("The failure to follow the requirements of section 214(c)(3) requires us to reverse the order of protection.").

¶ 44    Aida does not claim that the court made those two findings; she argues, instead, that the evidence was sufficient to support those findings. Aside from the fact that the trial court seemed to believe otherwise, as just noted above, the sufficiency of the proof is not the issue; nor is it enough that the court obviously listened to the evidence and gave it due consideration. See *Landmann*, 2019 IL App (5th) 180137, ¶ 18 (court's statement that it heard evidence and reviewed petition was not substitute for required findings under section 214(c)); *Martinez*, 2021 IL App (1st) 201027-U, ¶ 28 (same). The court did not make the mandatory findings, and that constitutes reversible error. We must reverse the OP.

¶ 45    As a consequence, we likewise must reverse the court's April 9 monetary judgment in favor of Aida. The award of moving and travel expenses was part and parcel of the OP under the IDVA. 750 ILCS 60/214(b)(13) (West 2024). That award does not stand independently.

¶ 46    That is not to say that a petitioner in this situation is without recourse to seek damages for an illegal eviction, even if that eviction is in the past and presents no threat of future harm to the petitioner. A traditional civil lawsuit is available in that instance.

¶ 47                                    CONCLUSION

¶ 48    The judgment of the circuit court, including the order of protection and the monetary judgment against Robinson, are reversed.

¶ 49    Reversed.